**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 14-1890

———————

UNITED STATES OF AMERICA

v.

SATIEK DUNCAN,
                    Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. No. 2:13-cr-00041-001)
District Judge: Honorable Michael M. Baylson

———————

Submitted Under Third Circuit L.A.R. 34.1(a)
April 14, 2015

———————

Before: AMBRO, VANASKIE, and SHWARTZ, *Circuit Judges*.

(Opinion Filed:  July 2, 2015)

———————

OPINION[*]

———————

VANASKIE, *Circuit Judge*.

A jury convicted Appellant Satiek Duncan of one count of conspiracy to distribute

28 grams or more of cocaine base ("crack cocaine"), in violation of 21 U.S.C. § 846.  His

———————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

appeal presents three issues for our consideration: (1) whether the District Court erred in admitting testimony under Fed. R. Evid. 801(d)(2)(E) concerning the different hairstyles of Duncan and his twin brother, Jamaal;[1] (2) whether the District Court erred in admitting testimony under Fed. R. Evid. 404(b) regarding a joint purchase of a large quantity of cocaine by Duncan and the witness; and (3) whether the District Court plainly erred in imposing a fine of $4,000. For the reasons that follow, we will affirm.

## I.

In 2012, Duncan (also known as "Twin") was targeted as part of a drug trafficking investigation in South Philadelphia. As part of this investigation, James Allen, an undercover officer, purchased crack cocaine from Cedric Green. Green procured the crack cocaine from Duncan and other suppliers. Allen made a total of four purchases from Green between July and September of 2012, two of which implicated Duncan.

The first exchange took place on July 16, 2012. Green accompanied Allen to a location where Duncan arrived in a rented Chevrolet Equinox. Green approached Duncan's vehicle and entered through the front passenger door. Green returned to Allen's vehicle and gave him the crack cocaine. Officers surveilling the scene observed that Duncan was heavy-set and had tight "cornrow" braids. After the sale, officers followed Duncan to 634 Winton Street, a residence he shared with his twin brother, Jamaal, and several other relatives.

---

[1] For ease of reference, we will refer to Appellant Satiek Duncan as "Duncan" and, where applicable, to his twin brother as "Jamaal."

On August 9, 2012, Allen again arranged to purchase drugs from Green. During this exchange, Allen wore audio and video recording equipment to document the conversation. This transaction followed the same pattern as the first. When Allen contacted Green, he assumed the drugs would be coming from Duncan. However, Green told him the crack cocaine would be supplied by Duncan's cousin, Kamal Washington. Green assured Allen that Duncan and Washington "both get their soft, meaning powder cocaine, from the same distributor," (App. at 138), signifying that the quality of the crack cocaine would be the same. During this conversation, Green told Allen that Duncan had a twin brother, Jamaal, who also was a drug dealer. However, Green stated that he did not work with Jamaal. Green went on to explain that the Duncan twins looked very similar, but that Jamaal had "a low cut." (App. at 486.)

Allen purchased drugs from Green a third time on August 15, 2012. After Green said that he had received these drugs from an unidentified supplier, Allen insisted that Green use Duncan for all future transactions because he was not satisfied with the quality of the crack cocaine provided by the other suppliers.

On September 14, 2012, Allen contacted Green to arrange a purchase of crack cocaine from Duncan. Allen told Green he was looking to buy two ounces of crack cocaine for $2,400. As they did before, Allen and Green went to a predetermined location to wait for Duncan. Shortly thereafter, Duncan arrived in a rented Ford F-150. This transaction followed the same pattern as the first, with Green entering Duncan's truck, exchanging the money for the crack cocaine, and returning to Allen's car with the drugs. Officers again followed Duncan to 634 Winton Street.

3

On January 30, 2013, a grand jury in the Eastern District of Pennsylvania indicted Duncan on five counts stemming from the aforementioned drug transactions. He was charged with one count of conspiracy to distribute 28 grams or more of crack cocaine, in violation of 21 U.S.C. § 846; one count of distribution of, and aiding and abetting the distribution of, 28 grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; one count of distribution of, and aiding and abetting the distribution of a mixture and substance containing a detectable amount of crack cocaine, in violation of 28 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and two counts of distribution of controlled substances within 1,000 feet of a protected location, in violation of 21 U.S.C. § 860.

On April 30, 2013, Duncan was arrested by federal law enforcement in connection with the indictment. On his person, agents found a cell phone bearing the phone number used to facilitate the September 14th transaction and a driver's license listing his address as 634 Winton Street. In his driver's license photograph, his hair was braided. Further investigation revealed that both vehicles Duncan used during the drug deals were rented from Budget Rent-A-Car under his name and paid for with his debit card. Cell phone records corroborated the calls between Duncan, Allen, and Green during the course of the sales.

On August 23, 2013, the Government filed a motion in limine to admit the recorded testimony of Allen's conversation with Green from the August 9, 2012, drug transaction, on the theory that the recordings were admissible under Fed. R. Evid. 801(d)(2)(E) as a statement made by a co-conspirator in furtherance of the conspiracy. On December 11, 2013, a jury was empaneled. Two days later, the Government filed a

4

second motion in limine under Fed. R. Evid. 404(b) to permit Washington to testify about a joint purchase of cocaine he made with Duncan. That same day, Duncan filed a written opposition to the Government's 801(d)(2)(E) motion, and orally opposed the Government's 404(b) motion. By Orders dated December 16, 2013, the District Court granted both motions, but, in admitting the 404(b) evidence, limited Washington's testimony to joint purchases of cocaine that occurred "prior to July 16, 2012." (App. at 48, 62.)

On December 18, 2013, the jury convicted Duncan of one count of conspiracy to distribute 28 grams or more of crack cocaine, in violation of 21 U.S.C. § 846. He was acquitted on all other counts. On April 10, 2014, the District Court sentenced Duncan to the mandatory minimum sentence of 120 months' imprisonment to be followed by a five-year term of supervised release. The District Court also imposed a $4,000 fine, well-below the United States Sentencing Guidelines recommended minimum of $12,500. U.S.S.G. § 5E1.2(c)(4). Duncan timely appealed.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## III.

Duncan argues the District Court erred by: (1) admitting Green's recorded statements concerning Jamaal's hairstyle because it was not "in furtherance of" the conspiracy between Green, Duncan, and Allen, as required by Fed. R. Evid. 801(d)(2)(E), and (2) admitting Washington's testimony concerning Duncan's purchase of a large

5

quantity of cocaine prior to July 16, 2012 because the Government failed to meet the requirements of Fed. R. Evid. 404(b). We review a district court's rulings as to the admissibility of evidence for abuse of discretion. *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000). However, our review is plenary to the extent that such rulings are based on an interpretation of the Federal Rules of Evidence. *Id*.

## A.    The Recorded Conversation Between Green and Allen

Duncan first challenges the admission of Green's recorded statements under Fed. R. Evid. 801(d)(2)(E). The evidence consisted of an audio recording, which the Government played for the jury, and a transcript of that same exchange that was entered into evidence as Government Exhibit 6A. (App. at 485–86.) During that exchange, Green described Duncan's twin brother, Jamaal, as having "a low cut" as a way of distinguishing him from Duncan. (App. at 486.)

Duncan challenges the admission of this statement on the ground that it was not made in furtherance of the drug-trafficking conspiracy.[2] Specifically, he contends that Green's physical description of Jamaal Duncan having a "low cut" was "extraneous to the broader context of the exchange, serving only to preface an amusing, digressive reminiscence upon how much Twin looked like his brother." Appellant's Reply Br. at 3. Duncan asserts that, because Allen always bought from Green, rather than directly from

---

[2] Duncan does not dispute that the other requirements for admission are satisfied. That is, Duncan concedes that a conspiracy existed, that he and the declarant, Green, were members of the conspiracy, and that Green's recorded statements was made in the course of the conspiracy. *See United States v. Bobb*, 471 F.3d 491, 498 (3d Cir. 2006)) (identifying requirements for admission of evidence under Fed. R. Evid. 801(d)(2)(E)).

Duncan, he had no "reason to know" what type of hair styles the twins had. Appellant's Br. at 29 (citing *United States v. Provenzano*, 620 F.2d 985, 1001 (3d Cir. 1980)).

Duncan's reliance on *Provenzano* is unavailing. In that case, we held that statements made by one conspirator to two errand runners were not made "in furtherance" of the conspiracy because the errand runners had no reason to know of the conspiracy. *Id.* Here, the statements at issue were made between co-conspirators and were made in the course of the conspiracy to distribute crack cocaine. More specifically, Green named his suppliers, and discussed how those suppliers were related and how to identify which of the Duncan twins was Green's supplier.

Although the information concerning Jamaal's hairstyle was not necessary to facilitate the conspiracy, the discussion identified which of two drug-dealing identical twins was a member of Green's chain-of-supply. This explanation ensured that Allen would know from whom Green procured crack cocaine. Such statements are "made in furtherance of the conspiracy because it was directed at a potentially recurring customer ([the undercover agent]) with the intention of reassuring him of [the supplier's] reliability[.]" *United States v. Mooneyham*, 473 F.3d 280, 286 (6th Cir. 2007). We have explained that the "in furtherance" prerequisite should be given a broad interpretation, *see United States v. Weaver*, 507 F.3d 178, 183 (3d Cir. 2007), and the District Court's admission of Green's description of Jamaal is not inconsistent with according wide latitude to the "in furtherance" requirement.

**B.     Admission of Kamal Washington's "Other Acts" Testimony**

7

Duncan next argues that the District Court committed reversible error by admitting Washington's testimony that he and Duncan purchased a large quantity of cocaine together prior to July 16, 2012, which was later cooked into crack cocaine and sold to Allen, among others. As part of this contention, he raises four errors for our review: (1) the Government failed to afford him sufficient notice of the proffered testimony; (2) the Government failed to show how this evidence was relevant; (3) the Government failed to establish that the evidence was not unfairly prejudicial under Rule 403(b); and (4) the District Court's jury instructions permitted a conviction based on the uncharged acts of purchasing cocaine with Washington prior to July 2012. We address each contention in turn.

### 1. Lack of Pre-Trial Notice

Duncan first asserts that Government failed to give him pre-trial notice of the evidence as required by Fed. R. Evid. 404(b)(2). Nonetheless, he concedes that at the trial level "[t]he defense did not request a continuance or specifically object to the lack of pretrial notice." Appellant's Br. at 39 n.11. Based on this failure to object, we review this portion of Duncan's claim only for plain error. *United States v. Moore*, 375 F.3d 259, 262 (3d Cir. 2004). Under this standard, Duncan must demonstrate, among other things, that the error affected "substantial rights," *id.*, "which means that there must be a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 560 U.S. 258, 262 (2010). His only claim of prejudice is that the defense "could have adjusted its trial presentation to ensure the jury did not become confused by

Washington's testimony."  Appellant's Br. at 40.  This conclusory and vague assertion is insufficient to meet the high burden required under the plain error standard.[3]

## 2.     **The 404(b) Analysis**

Duncan concedes that the Government offered the evidence of Duncan and Washington's joint purchase of cocaine under Fed. R. Evid. 404(b) for a non-propensity purpose, but asserts the evidence was not relevant to that purpose.[4]  As to relevance, the Government articulated that the evidence "establish[ed] Kamal Washington's knowledge of Cedric Green as a drug customer of himself and Satiek Duncan, setting a foundation for the conversations between Washington and Duncan regarding providing crack cocaine to Green during the time of this investigation."  (App. at 59.)  Duncan does not

---

[3] Even if Duncan had expressly objected to the evidence based upon the timing of the notice, this would not have been a reason to bar the evidence in this case.  The Government promptly informed Duncan of the evidence when it received it and there is no hint that it was withheld to provide the Government a strategic advantage.  Moreover, Duncan has not explained how his strategy would have changed had he received more advance notice.  He had access to the information before his opening statement and thus, throughout the entire trial, including during his cross-examination of Washington.  Therefore, the District Court did not abuse its discretion in admitting the testimony.

[4] As we recently explained in *United States v. Caldwell*, 760 F.3d 267, 277–78 (3d Cir. 2014):

> [P]rior act evidence is inadmissible unless the evidence is (1) offered for a proper non-propensity purpose that is at issue in the case; (2) relevant to that identified purpose; (3) sufficiently probative under Rule 403 such that its probative value is not outweighed by any inherent danger of unfair prejudice; and (4) accompanied by a limiting instruction, if requested.

9

rebut the Government's representation, but simply argues that the evidence was wholly irrelevant.

We have held that prior bad acts evidence is relevant insofar as it "cast[s] light . . . on the relationship, if any, existing between . . . defendants." *United States v. Dansker*, 537 F.2d 40, 58 (3d Cir. 1976). Here, Washington's testimony framed the relationship among himself, Green, and Duncan. Washington testified that he and Duncan purchased large quantities of powder cocaine, which they then cooked into crack cocaine and subsequently provided to Green to sell directly to customers, including Allen. The District Court did not abuse its discretion in finding the evidence was relevant to show Duncan's relationship to Washington, a fellow drug supplier, and Green, one of Duncan's distributors. *See United States v. Simmons*, 679 F.2d 1042, 1050 (3d Cir. 1982) (testimony of "a co-conspirator and the key prosecution witness, could be considered as relevant to provide necessary background information, to show an ongoing relationship between [defendants], and to help the jury understand [the witness's] role in the scheme").

Furthermore, Duncan's central line of defense was mistaken identity. He argued it was actually his brother, Jamaal, who supplied crack cocaine to Green. At sidebar, the Government explained that Washington's testimony also "goes to the identity issue." (App. at 311.) We agree that Washington's testimony supported an inference that it was Duncan who conspired with Green to sell crack cocaine. Because the evidence was also germane to Duncan's identity as Green's supplier, the District Court did not abuse its discretion in admitting that evidence.

10

### 3. **Unfair Prejudice Under 403(b)**

Duncan also contends the District Court erred by failing to determine whether the probative value of this evidence outweighed its prejudicial effect under Fed. R. Evid. 403. In this respect, Duncan's argument relies wholly on "the government's failure to articulate a valid chain of inferences . . . [indicating] that Washington's testimony would have any probative value." Appellant's Br. at 44. As explained above, the evidence was relevant to explain the relationship among Washington, Duncan, and Green, as well as to identify Duncan as the source of the drugs Green sold to Allen. Because Duncan has not articulated how this evidence is *unfairly* prejudicial given the proper relevant purposes for which it was admitted, we discern no error.

### 4. **The Jury Instructions**

Duncan contends the District Court's limiting instructions, both at the time of the testimony and after trial, "aggravated the unfair prejudice" of Washington's testimony. Appellant's Br. at 46. Because he did not contemporaneously object to those instructions, we review them for plain error. *United States v. Lee*, 612 F.3d 170, 191 (3d Cir. 2010).

Just before Washington testified, the District Court instructed the jury that it could not consider his testimony "as evidence for bad character of Mr. Duncan, nor . . . as any evidence showing any propensity by Mr. Duncan to commit a crime." (App. at 234–35.) The District Court reiterated the limited purpose for which Washington's testimony could be considered in the final jury instructions. Nothing about the instructions contradicted

11

the text of the Federal Rules of Evidence or our own case law.  Accordingly, Duncan is not entitled to relief on this basis.

IV.

Finally, Duncan argues that the District Court made insufficient findings concerning his ability to pay a $4,000 fine.  Because he did not raise the issue of his ability to pay before the District Court, we review this issue for plain error.  *United States v. Torres,* 209 F.3d 308, 313 (3d Cir. 2000).

We have held that specific findings of ability to pay a fine are not necessary where the Presentence Report (PSR) adopted by the District Court "contains adequate factual findings with reference to an ability to pay such that there can be effective appellate review."  *Id*. at 314.  Notably, the PSR in this case, which the District Court adopted without objection, does not indicate that Duncan was unable to pay any fine—it simply states that he could not pay a fine within the advisory guideline range.  The District Court imposed a fine well below the advisory guideline minimum of $12,500.  (PSR ¶ 89.)  Furthermore, the District Court directed that Duncan make payments at the rate of $25 per quarter while incarcerated, with the balance remaining after he is released from prison being in monthly installments of $50 over the five-year term of his supervised release.  Duncan is a high school graduate, presents no physical or mental impairments that would keep him from working, has maintained various jobs in the past, and owns property in Florida worth approximately $15,000.  (PSR ¶¶ 59–79.)  Under these circumstances, the District Court's determination that Duncan should pay a $4,000 fine over the course of his incarceration and period of supervised release was not plainly erroneous.

12

V.

For the foregoing reasons, we will affirm Duncan's conviction and sentence.[5]

---

[5] Duncan additionally argues that he was sentenced "to an increased mandatory minimum penalty applicable where the defendant has 'a prior conviction for a felony drug offense [that] has become final.'" Appellant's Br. at 56 (quoting 21 U.S.C. § 841(b)(1)(B)). Although he contends his prior conviction was "never charged in the indictment, submitted to the jury, or found proven beyond a reasonable doubt[,]" he concedes that "controlling precedent of this Court forecloses relief on this claim at this time." Appellant's Br. at 56 (citing *United States v. Coleman*, 451 F.3d 154, 159–60 (3d Cir. 2006); *United States v. Ordaz*, 398 F.3d 236, 240–41 (3d Cir. 2005)). Therefore, Duncan is not entitled to relief on this basis.